19 So.3d 184 (2009)
Louis Frank HOLLANDER, Jr.
v.
Raymond Lee NICHOLS, Jr., et al.
1061094.
Supreme Court of Alabama.
March 20, 2009.
*185 Michael L. Weathers, Florence, for appellant.
Nicolas B. Roth and Heather N. Hudson of Eyster, Key, Tubb, Roth, Middleton & Adams, LLP, Decatur, for appellees.
SMITH, Justice.
Louis Frank Hollander, Jr., appeals from a summary judgment entered in favor of Raymond Lee Nichols, Jr., the North Alabama Bone and Joint Clinic, P.C. ("the Clinic"), and Shoals Orthopedics, P.C. We affirm in part, reverse in part, and remand.

Facts and Procedural History
Many of the facts relevant to this appeal are included in this Court's decision in Coca-Cola Bottling Co. Consolidated v. Hollander, 885 So.2d 125 (Ala.2003) ("Hollander I"), which involved a separate action Hollander brought against Coca-Coca Bottling Co. Consolidated ("CCBCC"). Those facts are as follows:
"Hollander was employed by CCBCC at its facility in Florence, Alabama, to *186 deliver soft-drink vending machines and coolers. He was injured on Friday, August 27, 1999, when a fully loaded soft-drink vending machine, weighing between 700 and 1,000 pounds, fell on him while he and another worker were moving it into an elementary school in Collinwood, Tennessee. Hollander's legs were pinned for between 5 to 10 minutes, and it took 8 to 11 people to lift the machine off Hollander.
"On the day of the incident, Hollander reported this incident to his supervisor, William Talley. According to CCBCC, Talley asked Hollander if he had been injured when the machine fell on him and if he needed medical care, and Hollander said that he had suffered a cut on his leg but that he did not require medical treatment. Hollander says that Talley did not ask him if he needed to see a doctor and that he waited for guidance from Talley instead of asking to see a doctor. CCBCC's employee handbook requires that all injuries, `no matter how minor,' be reported immediately to the injured employee's supervisor, `who will take whatever actions necessary to insure required medical treatment is authorized and attained and that the First Report of Injury is completed. The Employee will be referred to a doctor of CCBCC's choice.' It is undisputed that Hollander complied with that policy.
"Talley reported the accident to CCBCC's third-party accident claims administrator. The administrator completed a `first report of injury' form. In accordance with CCBCC's standard procedure, Talley also completed a supervisor's accident report. Hollander and his coworker continued to deliver and retrieve vending machines on the day Hollander was injured. Hollander claims that he could not drive the delivery truck after the machine fell on him on August 27 because of the condition of his legs and that his coworker, who did not have a commercial driver's license, drove the truck the rest of the day. However, Hollander's coworker testified that he did not drive the truck. After arriving at CCBCC's facility in Tennessee at approximately 5:00 p.m., Hollander and his coworker began using a forklift to load machines onto the truck for delivery the next day. As Hollander was driving the forklift to load a machine, the machine fell off the forklift.
"On Monday August 30, Hollander visited Dr. Glen Sockwell complaining of stress and shortness of breath. On August 31, Hollander left Talley's office, stating, `I can't do this.' On that same day Hollander visited Dr. Sockwell again. Dr. Sockwell's office notes from August 30 and 31 mention nothing about an injury to Hollander's legs or his August 27 injury. Also, on August 31 Dr. Sockwell gave Hollander a work-release slip excusing him from work for the period August 31 through September 12.
"On September 1, 1999, Hollander visited the North Alabama Bone and Joint Clinic, a group of physicians approved by CCBCC to treat work-related injuries of its employees. Hollander saw Dr. Lee Nichols, one of the physicians at the clinic, and complained of pain in his right knee and left ankle as a result of the August 27 incident. Dr. Nichols did not consider it necessary to excuse Hollander from work because of the injury to his legs. Hollander has not made any claim based on the injuries he suffered as a result of the August 27 incident other than a claim for the medical expenses incurred in his September 1 visit to Dr. Nichols.
"On September 7, Joe Clayton, general manager of CCBCC's Florence facility, learned for the first time that Hollander was seeking workers' compensation *187 benefits for a heart condition and stress, for which Dr. Sockwell treated him on August 30 and 31. Clayton informed the claims administrator of Hollander's claim and completed a first report of injury form related to Hollander's heart condition and stress-related complaint. Robyn Masoner, a benefits coordinator with CCBCC, forwarded Dr. Sockwell's work-release slip to Lou Jane Miller, CCBCC's environmental safety manager at its offices in Brentwood, Tennessee, who was responsible for deciding whether an employee's claim was compensable. Miller told Masoner that CCBCC did not consider Hollander's heart condition and stress claim to be based on a compensable injury.
"On September 8, Hollander returned to Dr. Sockwell's office; he denies that he returned to Dr. Nichols's office on that date. Dr. Nichols reported in his notes that he saw Hollander on September 8, but he admits that those notes are incorrect and that he actually had a telephone conversation with Hollander on that date. Dr. Nichols testified that in that telephone conversation Hollander asked him to
"`write a work release or an excuse from work from the date of his [August 27] injury, because he said that when he presented the work release Dr. Sockwell gave him, his employer would not accept Dr. Sockwell's work release because he was not their company doctor.'
"Dr. Nichols admitted that his notes were in error in stating that he saw Hollander on September 8; he testified, however, that he could not have been mistaken as to Hollander's asking him to backdate a work-release slip for him. As part of the regular claims procedure, Dr. Nichols's office faxed the medical record notes of September 1, 1999, and September 8, 1999, to Miller at CCBCC's offices in Brentwood, Tennessee. On September 13, 1999, Miller faxed the notes to Clayton at CCBCC's Florence facility, and he determined that, in asking Dr. Nichols to backdate a work-release slip, Hollander had been dishonest.
"Before the conversation with Dr. Nichols related above, Hollander had made numerous telephone calls to Masoner and Miller inquiring about his workers' compensation claim. Masoner told Hollander that he was not eligible for short-term disability to cover his time off work after September 1, and Hollander had already used all of his vacation time. According to Masoner's testimony, at some point after learning the above, Hollander asked:
"`What if I call my Worker's Comp doctor [Dr. Nichols] back, the original doctor back that I went to for my Worker's Comp injury, and get them to say that the reason I was off was due to the Worker's Comp [August 27] injury?'
"Masoner's answer was that Hollander could not do that and that such an action `would be dishonest, and it would be a falsification.' Hollander denies that he told Masoner what she claims he did. After the telephone call with Hollander in which she says he inquired about talking to Dr. Nichols, Masoner telephoned Miller and told her about the conversation. It is at this point that Hollander allegedly telephoned Dr. Nichols to tell him that his employer would not accept Dr. Sockwell's work-release slip because Dr. Sockwell was not a doctor approved by CCBCC and to ask Dr. Nichols to backdate a work-release slip so that Hollander could be *188 paid for his time off. Dr. Nichols informed him that he would not backdate a work-release slip, and that, in any event, in his opinion Hollander could perform his work without any restrictions.
"On September 13, 1999, Hollander returned to work. On September 14, Talley and Clayton2 informed Hollander that he was being terminated from his job for attempting to have Dr. Nichols backdate a work-release slip. Talley also showed Hollander Dr. Nichols's notes and gave him a corrective action form, dated September 14, 1999. Hollander told Talley that he never asked Dr. Nichols to backdate a work-release slip and he refused to sign the corrective action form but instead wrote the following and initialed the form:
"`Would like to talk to Dr. Nichols before I sign anything. F.H.'
"Clayton testified that the sole reason Hollander's employment was terminated was for dishonesty, based on Dr. Nichols's notes indicating that Hollander had attempted to get Dr. Nichols to backdate a work-release slip. Hollander himself testified that because of the nature of his jobcarrying large amounts of cash for use in the vending machinesdishonesty was a legitimate reason for CCBCC to terminate his employment. Talley completed an employee-separation form, which had specific codes for the reasons for terminating an employee. Talley chose 12D as the reason Hollander was terminated, the only category close in class to the offense Hollander was suspected of. It stated: `Termination-Falsifying Company Documents.'
"2 Hollander claims that only Talley informed him that he was being terminated."
Hollander I, 885 So.2d at 126-29.
After his termination, Hollander sued CCBCC, alleging retaliatory discharge in violation of § 25-5-11.1, Ala.Code 1975, which prohibits an employer from discharging an employee "`solely because the employee has instituted or maintained any action against the employer to recover workers' compensation benefits.'" 885 So.2d at 126 & n. 1 (quoting § 25-5-11.1). The case was tried before a jury, and Hollander received a verdict in his favor. 885 So.2d at 126. On appeal, however, this Court reversed the judgment entered on that verdict and held that CCBCC was entitled to a judgment as a matter of law ("JML") on Hollander's claims. 885 So.2d at 133.
A majority of the Court agreed with the result in Hollander I, but only a three-Justice plurality agreed with the rationale supporting that result. The plurality noted that even if Hollander had made a prima facie case against CCBCC, his retaliatory-discharge claim failed because CCBCC had offered uncontroverted "evidence indicating that it terminated Hollander for dishonesty." 885 So.2d at 131. In the view of the plurality,
"Hollander presented no evidence indicating that CCBCC used dishonesty as a pretext for terminating employees who had filed workers' compensation claims, that CCBCC's termination of Hollander violated any company policy, or that CCBCC ever acknowledged that its stated reason for terminating Hollander's employment was pretextual. Therefore, CCBCC's stated reason for terminating Hollander's employment precludes a finding that the fact that he filed a workers' compensation claim was the `sole' *189 cause of his termination."[1]
885 So.2d at 133.
The appeal in the instant case arises from a separate action Hollander filed against Dr. Nichols, the Clinic, and Shoals Orthopedics, P.C., a corporation with which Dr. Nichols became affiliated after he left the Clinic (Dr. Nichols, the Clinic, and Shoals Orthopedics, P.C., are hereinafter collectively referred to as "the Nichols defendants"), alleging breach of contract, abuse of process, and defamation. The trial court entered a summary judgment in favor of the Nichols defendants as to all claims. The trial court later denied Hollander's motion to alter, amend, or vacate the judgment under Rule 59(e), Ala. R. Civ. P., and Hollander appealed.

Standard of Review
We review a summary judgment and all questions of law de novo. Smith v. State Farm Mut. Auto. Ins. Co., 952 So.2d 342, 346 (Ala.2006).

Discussion
As noted in the excerpt from Hollander I above, Hollander visited the facility operated by the Clinic and saw Dr. Nichols on September 1, 1999, and the Clinic faxed "the medical record notes" concerning that visit to CCBCC's offices. Also included in that fax were notes stating that Hollander had again visited Dr. Nichols at his office at the facility on September 8, 1999, and had allegedly asked Dr. Nichols to prepare a backdated work-release slip. However, Dr. Nichols testified in the trial in Hollander I that Hollander actually telephoned rather than visited Dr. Nichols's office on September 8, 1999, and, Dr. Nichols claimed, asked for a backdated work-release slip during that telephone conversation. Ultimately, CCBCC cited as its reason for firing Hollander the claim in the Clinic's records that Hollander had asked Dr. Nichols on September 8, 1999, for a backdated work-release slip.
In Hollander I, Hollander denied the allegation that he had asked Dr. Nichols to backdate a work-release slip. 885 So.2d at 132 ("Hollander claims that CCBCC and others involved in the claims process falsified records to cause him to be terminated and that CCBCC should have investigated the matter after Hollander denied that he had asked Dr. Nichols to backdate a work-release slip."). The three general claims in the underlying action in the present case all relate to Hollander's contention, which Hollander still maintains, that he did not ask Dr. Nichols to backdate a work-release slip.
Hollander's brief to this Court lists 15 issues on appeal. Each of those issues essentially argues that the trial court erred in entering a summary judgment as to one or more of Hollander's claims. Therefore, we address the summary judgment entered for the Nichols defendants *190 on Hollander's claims of breach of contract, abuse of process, and defamation. We also address Hollander's contention that he alleged tort claims based on a breach of a duty of confidentiality and that the trial court entered a summary judgment against him as to those claims.

I.
Hollander's complaint alleges a breach-of-contract claim against Dr. Nichols and the Clinic relating to the release of Hollander's medical records to CCBCC. Hollander asserts that, on September 10, 1999, he telephoned the Clinic and requested that Dr. Nichols and the Clinic "confirm to CCBCC's worker's compensation insurance company that he had been seen, examined, and treated by Dr. Nichols at [the Clinic]" on September 1, 1999. Hollander claims that he made that request "[i]n an effort to attempt to get his workers' compensation benefits for his August 27, 1999, on-the-job injury."
Hollander alleges that, among other things, Dr. Nichols told him on September 10, 1999, that Dr. Nichols and the Clinic "absolutely would not and could not send Hollander's records to CCBCC's workers' compensation insurance company because CCBCC had never authorized Nichols and/or [the Clinic] to see Hollander as a workers' compensation patient" and that, "because Hollander had never signed an authorization or release for Nichols and/or [the Clinic] to release Hollander's medical records to CCBCC as a private-pay patient, [the Clinic] and Nichols absolutely would not send any records to CCBCC." Thus, Hollander contends that, except for confirming the fact that Hollander had been seen and examined by Dr. Nichols on September 1, 1999, Dr. Nichols and the Clinic indicated they would not disclose any information to CCBCC or its workers' compensation insurance company.
Hollander contends that the subsequent release of those records to CCBCC was unauthorized and amounted to a breach by Dr. Nichols and the Clinic of a contract of confidentiality. Hollander cites Crippen v. Charter Southland Hospital, Inc., 534 So.2d 286, 288 (Ala.1988), in which this Court stated:
"A cause of action for the unauthorized release of medical records was first recognized by this Court in Horne v. Patton, 291 Ala. 701, 287 So.2d 824 (1973). In Horne this Court held that a medical doctor is under a duty not to make extra-judicial disclosures of the doctor-patient relationship and that a breach of that duty will give rise to a cause of action. Id., 291 Ala. at 708, 287 So.2d at 829. This Court further held that the unauthorized disclosure of intimate details of a patient's health may amount to such unwarranted publicization of one's private affairs with which the public has no legitimate concern as to cause outrage, mental suffering, shame, or humiliation to a person of ordinary sensibilities. Id., 291 Ala. at 709, 287 So.2d at 830. Finally, this Court held that the unauthorized release of medical records may amount to a breach of an implied contract of confidentiality on the part of the doctor. Id., 291 Ala. at 711, 287 So.2d at 832."
Dr. Nichols and the Clinic contend, however, that § 25-5-77(b), Ala.Code 1975, authorized the release of Hollander's records to CCBCC and that § 25-5-77 exempts them from liability on Hollander's claim alleging a breach of a contract of confidentiality.
Section 25-5-77(b) provides:
"If requested to do so by the employer, the injured employee shall submit to examination by the employer's physician at all reasonable times, but the employee shall have the right to have a physician *191 of his or her own selection present at the examination, in which case the employee shall be liable to the physician of his or her own selection for his or her services. The employer shall pay for the services of the physician making the examination at the instance of the employer.... A physician whose services are furnished or paid for by the employer, or a physician of the injured employee who treats or makes or is present at any examination of an injured employee may be required to testify as to any knowledge obtained by him or her in the course of the treatment or examination as the treatment or examination related to the injury or the disability arising therefrom. The physician shall, upon written request of the injured employee or his or her employer and without consent of or notice to the employee or employer not making the request, furnish the injured employee or his or her employer a written statement of his or her professional opinion as to the extent of the injury and disability. ... The term `physicians' shall include medical doctor, surgeon, and chiropractor. A hospital, medical clinic, rehabilitation service, or other person or entity providing treatment to an employee or providing facilities at which the employee receives treatment shall, upon the written request of the employee or of the employer, furnish, at a reasonable cost, the employee or the employer a copy of the records, including X-rays and laboratory reports, relating to the treatment of the injured employee. The copy may be furnished without the consent of or notice to the employee or employer not making the request. A physician, hospital, medical clinic, rehabilitation service, or other person or entity providing written statement of professional opinion or copies of records pursuant to this subsection shall not be liable to any person for a claim arising out of the release of medical information concerning the employee."
(Emphasis added.)
In entering a summary judgment against Hollander on the breach-of-contract claim, the trial court cited § 25-5-77, Ala.Code 1975. The trial court also concluded that "Dr. Nichols' medical records were provided to CCBCC `[a]s part of the regular claims procedure.'" Trial court's order (quoting Hollander I, 885 So.2d at 128). The trial court's order states that "having alleged retaliatory discharge in violation of Ala.Code 1975, § 25-5-11.1, in a prior action, [Hollander] is estopped from now claiming the workers' compensation act does not apply to give immunity to the [Nichols] defendants." Dr. Nichols and the Clinic make a similar argument to this Court, asserting that "[d]espite his previous position and suit for retaliatory discharge, [Hollander] in the present action takes the position that his dealings with the [Nichols] defendants did not involve a worker's compensation case after all." Hollander contends, however, that he is not estopped from claiming that § 25-5-77(b) does not apply to his claim against Dr. Nichols and the Clinic alleging the breach of a contract of confidentiality.
In support of their argument, Dr. Nichols and the Clinic rely on the doctrine of judicial estoppel.
"For judicial estoppel to apply,
"`"(1) `a party's later position must be "clearly inconsistent" with its earlier position'; (2) the party must have been successful in the prior proceeding so that `judicial acceptance of an inconsistent position in a later proceeding would create "the perception that either the first or second court was misled"' (quoting Edwards v. Aetna Life Ins. Co., 690 F.2d 595, 599 *192 (6th Cir.1982)); and (3) the party seeking to assert an inconsistent position must `derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.' 532 U.S. at 750-51, 121 S.Ct. 1808. No requirement of a showing of privity or reliance appears in the foregoing statement of factors to consider in determining the applicability of the doctrine of judicial estoppel."'
"Middleton v. Caterpillar Indus. Inc., 979 So.2d 53 (Ala.2007) (quoting Ex parte First Alabama Bank, 883 So.2d 1236, 1246 (Ala.2003) (citing in turn New Hampshire v. Maine, 532 U.S. 742, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001)))."
Chapman Nursing Home, Inc. v. McDonald 985 So.2d 914, 923-24 (Ala.2007). In the present case, Dr. Nichols and the Clinic have not shown that Hollander has taken a position in this action inconsistent with his position in Hollander I.
Hollander does not deny that he pursued a worker's compensation claim. Hollander argues, however, that Dr. Nichols and the Clinic have not demonstrated that they are entitled to the exemption-from-liability provision in § 25-5-77(b) as to Hollander's breach-of-contract claim. We agree.
The exemption-from-liability provision in § 25-5-77(b) states that "[a] physician, hospital, medical clinic, rehabilitation service, or other person or entity providing written statement of professional opinion or copies of records pursuant to this subsection shall not be liable to any person for a claim arising out of the release of medical information concerning the employee" (emphasis added). Thus, among other things, § 25-5-77(b) obligates a physician to provide medical information regarding an employee's injury only "upon written request of the injured employee or his or her employer."
In the present case, Dr. Nichols and the Clinic provided CCBCC with copies of all Hollander's medical records from the Clinic, but there is no evidence indicating that CCBCC or Hollander made a written request that those copies be provided to CCBCC. Because Dr. Nichols and the Clinic have not demonstrated that the copies of the medical records they sent to CCBCC were provided in accordance with § 25-5-77(b), Dr. Nichols and the Clinic have not demonstrated that they are entitled as a matter of law to the exemption-from-liability provision in § 25-5-77(b).[2] Consequently, the trial court erred in entering a summary judgment as to Hollander's breach-of-contract claim against Dr. Nichols and the Clinic for the alleged unauthorized disclosure of his medical records.[3]

II.
As noted above, Horne v. Patton, 291 Ala. 701, 287 So.2d 824 (1973), recognized that the unauthorized disclosure of medical records could give rise to an action sounding *193 in tort as well as a breach-of-contract action. In addition to his breach-of-contract claim, Hollander asserts on appeal that he alleged in the trial court tort claims based on a breach of a duty of confidentiality. Hollander contends that the trial court entered a summary judgment as to those tort claims and that it erred in doing so.
The parties agree that any such tort claims would be governed by the two-year statute of limitations applicable generally to tort actions. See § 6-2-38(l), Ala.Code 1975. The problem with Hollander's position, however, is that he did not amend his complaint to allege tort claims based on an alleged breach of a duty of confidentiality.
Following a hearing on October 7, 2003, the trial court issued a written order on October 15, 2003, stating:
"[I]t is understood that at this time [Hollander's claim against Dr. Nichols and the Clinic relating to the allegedly unauthorized disclosure of the medical records] is based upon contract and not tort. The Court understands that the plaintiff is going to amend his complaint to allege breaches of the duty of confidentiality within the last two years. Those actions may be brought in tort. At the present time, that is not the status."
(Emphasis added.) After the trial court issued that order, Hollander amended his complaint onceon May 2, 2005. That amendment, however, did not allege any tort claims based on a breach of the duty of confidentiality; rather, the amended complaint alleged claims of breach of contract, abuse of process, and defamation. Thus, there is no merit in Hollander's arguments on appeal regarding alleged tort claims based on the alleged breach of a duty of confidentiality.

III.
In the present case, Hollander alleges abuse of process against Dr. Nichols and Shoals Orthopedics relating to a small-claims action Dr. Nichols and Shoals Orthopedics filed against him. The trial court entered a summary judgment against Hollander on that claim because, the trial court held, Hollander failed to offer substantial evidence indicating that Dr. Nichols and Shoals Orthopedics acted with an ulterior purpose in seeking to recover payment through the small-claims action.
As a part of Hollander's retaliatory-discharge action against CCBCC, Hollander took Dr. Nichols's deposition on September 18, 2002. Dr. Nichols was not a named party in that action. According to an affidavit filed by Dr. Nichols in the present case, he customarily seeks payment for his time when he is requested to testify regarding a patient, and, after the deposition of September 18, 2002, Dr. Nichols sought to collect payment of his fee for testifying from Hollander. Hollander refused Dr. Nichols's request for payment, and Dr. Nichols, through Shoals Orthopedics, filed an action against Hollander on June 19, 2003, in small-claims court, seeking to recover the fee he alleged Hollander owed him.
To establish a claim of abuse of process, Hollander was required to offer substantial evidence indicating:
"`(1) the existence of an ulterior purpose; 2) a wrongful use of process, and 3) malice.' C.C. & J., Inc. v. Hagood, 711 So.2d 947, 950 (Ala.1998). `"[T]he [ulterior motive] must culminate in an actual abuse of the process by perverting it to a use to obtain a result which the process was not intended by law to effect ...."' Dempsey v. Denman, 442 So.2d 63, 65 (Ala.1983) (quoting 72 C.J.S. Process § 120, pp. 1190-91 (1951)) (emphasis *194 added). `"If the action is confined to its regular and legitimate function in relation to the cause of action stated in the complaint there is no abuse...."' Dempsey, 442 So.2d at 65 (quoting 1 Am.Jur.2d Abuse of Process § 13 (1962)) (emphasis added)."
Willis v. Parker, 814 So.2d 857, 865 (Ala. 2001). As to the requirement of showing an "ulterior purpose," this Court in Reynolds v. McEwen, 416 So.2d 702, 706 (Ala. 1982), stated:
"`The improper purpose usually takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself. ... There is, in other words, a form of extortion, and it is what is done in the course of negotiation, rather than the issuance or any formal use of the process itself, which constitutes the tort.'"
(Quoting W. Prosser, Handbook of the Law of Torts § 121 (4th ed.1971).)
We agree with the trial court that Hollander has failed to offer substantial evidence indicating that Dr. Nichols and Shoals Orthopedics acted with an ulterior purpose in filing the small-claims action against him. Hollander asserts that Dr. Nichols filed the action "with the ulterior, spiteful purpose and motive of perpetuating, remaking, and republishing the lies and slanderous, libelous, and defamatory statements he and [the Clinic] made and are making about Hollander in their falsified, fabricated, and fraudulent September 8, 1999, entries in Hollander's ... medical record." However, Hollander cites no evidence in support of that assertion.
Hollander also alleges that Dr. Nichols "filed the small claims case ... to wrongfully collect money he knows is not owed to him." Again, however, Hollander cites no evidence in support of that assertion.
Finally, Hollander claims that he and his wife visited Dr. Nichols at his office on September 22, 1999, and became involved in an argument with Dr. Nichols during which, Hollander alleges, Dr. Nichols stated that "he would have his `lawyer get' Hollander." However, even if that nonspecific allegation is true, Dr. Nichols did not file the small-claims action against Hollander until almost four years after he allegedly made the threat to have his "lawyer get" Hollander. Moreover, as noted, Dr. Nichols offered evidence in the form of his affidavit indicating that he pursued the small-claims action to collect what he thought to be a legitimate debt, and, at the time of the alleged threat (September 22, 1999), the deposition for which Dr. Nichols sought to recover payment in his small-claims action had not yet occurred. Hollander has offered no authority suggesting that a nonspecific threat like the one Dr. Nichols allegedly made is sufficient to indicate that an action filed almost four years after the alleged threat was pursued with an ulterior purpose. At most, the alleged threat by Dr. Nichols indicates that he held "ill will" toward Hollander, which is insufficient to establish that he acted with an ulterior purpose in pursuing his small-claims action. See Willis, 814 So.2d at 866. Consequently, the trial court did not err in entering a summary judgment against Hollander on his abuse-of-process claim.

IV.
Hollander's complaint also includes defamation claims against the Nichols defendants relating to the allegedly false information included in the medical records sent to CCBCC on or before September 13, 1999. Under § 6-2-38(k), Ala.Code 1975, "[a]ll actions of libel or slander must be brought within two years." The statute of limitations for a claim alleging defamation "begins to run at the time [the cause *195 of action] accrues, that is, when the defamatory matter is published." Tonsmeire v. Tonsmeire, 285 Ala. 454, 458, 233 So.2d 465, 467 (1970). Hollander did not file the present action until August 2003, more than two years after the medical records were sent to CCBCC, and the trial court held that Hollander's defamation claims were therefore time-barred.
Hollander contends that not all the defamation claims were untimely filed because, he says, the allegedly defamatory material was republished within the two-year period before the filing of the present action. Hollander submitted an affidavit in the trial court alleging that the Nichols defendants republished the allegedly defamatory medical records in the small-claims action filed on June 19, 2003, which was within the two years preceding the filing of Hollander's action in the present case. Hollander contends that a new cause of action accrued when those records were included in the small-claims action. Hollander cites Poff v. Hayes, 763 So.2d 234, 242 (Ala.2000), in which this Court stated: "[E]very distinct publication of libelous or slanderous material gives rise to a separate cause of action, even if the material communicated by each publication relates to the same matter as the previous publications. Age-Herald Publ'g Co. v. Waterman, 188 Ala. 272, 278, 66 So. 16, 18 (1913)."[4]
The trial court's summary-judgment order states that "[r]ecords provided pursuant to a lawsuit are not `publication' for purposes of a defamation claim" and that "[t]here is ... no evidence in the record of a republication." The Nichols defendants asserted in the trial court that the publication of the allegedly defamatory material within the small-claims action was privileged and that Hollander therefore could not recover for defamation based on that publication. This Court has recognized that a party that has published allegedly defamatory matter in the course of a judicial proceeding may claim, as a defense to a defamation action based on that publication, the absolute privilege described in the Restatement (Second) of Torts § 587 (1977). See Walker v. Majors, 496 So.2d 726, 729-30 (Ala.1986). See also Barnett v. Mobile Co. Pers. Bd., 536 So.2d 46 (Ala. 1988). Section 587 of the Restatement (Second) provides:
"A party to a private litigation or a private prosecutor or defendant in a criminal prosecution is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding, *196 or in the institution of or during the course and as a part of, a judicial proceeding in which he participates, if the matter has some relation to the proceeding."
The Nichols defendants demonstrated in the trial court that, as to Hollander's assertion that he may recover for defamation based upon the inclusion of the allegedly defamatory material in the small-claims action, they are entitled to the privilege recognized in the § 587 of the Restatement (Second) of Torts. Hollander did not contend in the trial court or in this Court that the Nichols defendants are not entitled to the privilege for the inclusion of the allegedly defamatory material in the small-claims action. Consequently, Hollander has not demonstrated that the trial court erred in entering a summary judgment against Hollander as to the defamation claim related to the inclusion of the material within the small-claims action.
Hollander also asserts generally that the Nichols defendants have republished the allegedly defamatory material on several other occasions, but the only specific publication alleged is the one that occurred in the small-claims action. Language in Poff suggests that a nonspecific allegation of the publication of allegedly defamatory material is sufficient to defeat a defendant's motion for a summary judgment. See Poff, 763 So.2d at 241. The plaintiff's complaint in Poff alleged that the defendant had "on many other numerous occasions" "libeled and slandered" him. This Court held that that language, along with other allegations in additional pleadings filed by the plaintiff, was sufficient for the finder of fact to determine that additional acts of publication had occurred on dates that were within the two-year statute of limitations. 763 So.2d at 241.
However, the plaintiff in Poff supported those general allegations only with evidence of two specific publications that allegedly occurred within the two-year limitations period, and this Court ultimately held that the plaintiff's defamation claims should be limited "to the two publications that occurred within the two years preceding the date [the plaintiff] filed his complaint." 763 So.2d at 242. Similarly, in the present case, Hollander has alleged multiple publications of the allegedly defamatory material, but the only specific evidence of an additional publication is the one that occurred in the small-claims action. Thus, under Poff, the only defamation claim that could have been timely filed in this case is the claim based on the publication that occurred in the small-claims action; however, as noted, Hollander cannot recover for that defamation claim because the Nichols defendants were privileged to make that publication. Consequently, the trial court did not err in entering a summary judgment against Hollander as to his defamation claims against the Nichols defendants.

V.
After the trial court entered the summary judgment in favor of the Nichols defendants, Hollander filed a Rule 59(e), Ala. R. Civ. P., motion to alter, amend, or vacate that judgment, and he requested a hearing on the motion. The trial court denied the Rule 59(e) motion, however, without holding a hearing. Hollander contends that the trial court's denial of the Rule 59(e) motion without a hearing was reversible error.
Rule 59(g), Ala. R. Civ. P., provides that a posttrial motion "shall not be ruled upon until the parties have had opportunity to be heard thereon." In Flagstar Enterprises, Inc. v. Foster, 779 So.2d 1220, 1221 (Ala.2000), this Court stated:
"[I]f a party requests a hearing on its motions for a new trial, the court must *197 grant the request. Rule 59(g), Ala. R. Civ. P. See Walls v. Bank of Prattville, 554 So.2d 381, 382 (Ala.1989) (`[W]here a hearing on a motion for [a] new trial is requested pursuant to Rule 59(g), the trial court errs in not granting such a hearing.'). Although it is error for the trial court not to grant such a hearing, this error is not necessarily reversible error. For example, if an appellate court determines that there was no probable merit to the motion, it may affirm based on the harmless-error rule. See Rule 45, Ala. R.App. P.; and Kitchens v. Maye, 623 So.2d 1082, 1088 (Ala. 1993) (`failure to grant a hearing on a motion for new trial pursuant to Rule 59(g) is reversible error only if it "probably injuriously affected substantial rights of the parties"')."
As noted in Kitchens v. Maye, 623 So.2d 1082, 1088-89 (Ala.1993):
"In Greene v. Thompson, [554 So.2d 376, 381 (Ala.1989)], this Court formulated a test to determine when the denial of a Rule 59(g) request for a hearing is harmless error:
"`Harmless error occurs, within the context of a Rule 59(g) motion, where there is either no probable merit in the grounds asserted in the motion, or where the appellate court resolves the issues presented therein, as a matter of law, adversely to the movant, by application of the same objective standard of review as that applied in the trial court.'"
Our de novo review of the summary judgment entered against Hollander is "the same objective standard of review as that applied in the trial court." Insofar as we are reversing the summary judgment, Hollander is obtaining the relief he could have obtained if the trial court had held a hearing on the Rule 59(e) motion. There is no probable merit as to the remainder of Hollander's claims. Thus, the trial court's failure to hold a hearing on the Rule 59(e) motion was harmless error.

Conclusion
The summary judgment is reversed as to Hollander's breach-of-contract claim against Dr. Nichols and the Clinic; the summary judgment is affirmed as to the remainder of Hollander's claims; and the cause is remanded.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
COBB, C.J., and LYONS, WOODALL, STUART, BOLIN, PARKER, and SHAW, JJ., concur.
MURDOCK, J., concurs specially.
MURDOCK, Justice (concurring specially).
I concur with the main opinion. In so doing, I do not read the main opinion as addressing whether the release by a physician to an employer of the type information at issue here (an allegedly improper request to backdate medical records) constitutes the release of "intimate details of the patient's health" as contemplated in Crippen v. Charter Southland Hospital, Inc., 534 So.2d 286, 288 (Ala.1988), or otherwise falls within the duty of confidentiality with which that case is concerned. By the same token, I do not read the main opinion as addressing whether § 25-5-77, Ala.Code 1975, has any field of operation in regard to this type of information.
NOTES
[1] Justice Houston later dissented from the denial of Hollander's application for rehearing in Hollander I. He wrote:

"I am persuaded that Coca-Cola Bottling Co. Consolidated (`CCBCC') knew that Louis Frank Hollander denied ever asking Dr. Lee Nichols to backdate a work-release slip, to misstate or misrepresent anything, or to falsify any medical record of any kind before CCBCC discharged Hollander for dishonesty. Hollander told his supervisor, William Talley, that Dr. Nichols's statement that Hollander had asked him to backdate a work-release slip was untrue. It is without dispute that some portions of the medical records Dr. Nichols kept relating to Hollander were untrue. Therefore, I am now persuaded that whether CCBCC's reason for discharging Hollander was a pretext was for the trier of the fact, who decided this issue in favor of Hollander."
885 So.2d at 135 (Houston, J., dissenting from the denial of rehearing).
[2] In addressing this issue, we hold only that, because there is no evidence of a written request from CCBCC or Hollander for Hollander's records, Dr. Nichols and the Clinic failed to demonstrate that § 25-5-77(b) applies. Our holding in that regard, however, should not be construed as implying that if such a written request had been made, § 25-5-77(b) indeed would apply to the particular facts of this case; as to that question, we express no opinion.
[3] The parties agree that a six-year statute of limitations applies to Hollander's breach-of-contract claim. See § 6-2-34(9), Ala.Code 1975 (specifying a six-year statute of limitations for "[a]ctions upon any simple contract or speciality not specifically enumerated in this section").
[4] In a footnote, the Poff Court noted:

"The `single-publication' rule, generally applicable only to newspapers and similar media, is a notable exception to this general rule. That exception does not govern the resolution of this case, because of the nature of this defendant's alleged publications. An early statement of this exception is found in Age-Herald Publ'g Co. v. Huddleston, 207 Ala. 40, 92 So. 193 (1921). In that case, this Court held that `repetition or republication of [an] identical libel [and slander] is not a new cause of action for which a separate suit may be maintained, but is merely an aggravation of the pre-existing cause, and in proper cases may tend to show actual malice.' Age-Herald Publ'g Co., 207 Ala. at 44, 92 So. at 197. Hayes essentially argues that this exception applies to this present case because in each publication, Poff, he says, communicated the same defamatory information. We find fault with this argument because the exception enunciated in Age-Herald Publ'g Co. only applies only to situations where subsequent acts of defamation are verbatim republications of previously made libelous or slanderous statements. See id. Age-Herald Publ'g Co. v. Huddleston is inapposite to the case before us because each of Poff's alleged publications was a separate communication distinct from all others allegedly made."
763 So.2d at 242 n. 5.